UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| 440 West 164th Street Housing Development | Case No. 15-20003(RDD) |
| Fund Corporation, | |
| Debtor. | |

-------------------------------------------------------------x

## OBJECTION OF KHITTERER PARTIES TO
## APPROVAL OF DEBTOR'S DISCLOSURE STATEMENT

Inna Khitterer, individually and as assignee of Lothar Kroll, Andreas Kroll, and Sergei Leontev ("Khitterer"), a shareholder and party in interest in 440 West 164 Street Housing Development Fund Corporation (the "Debtor"), by and through her undersigned counsel, pursuant to section 1125 of the Bankruptcy Code, hereby objects to approval of the Debtor's proposed Disclosure Statement filed on or about March 17, 2016. In support of this Objection, Khitterer respectfully submits as follows:

### PRELIMINARY STATEMENT

1. This bankruptcy process is being overseen by the Debtor's purported Board president, Mark Schwartz ("Schwartz"), and his long-time business partner, David Goldwasser ("Goldwasser"). The plan process Schwartz/Goldwasser has implemented is aimed at displacing unit holders from their homes at prices substantially below fair market value. The Debtor's equity holders who are the owners of units at the Debtor's premises, as well as the tenants residing at the property, on the other hand, have been ill-informed, in fact misinformed, about the true nature of this process.

1

2.  The very purpose of a disclosure statement is to provide parties-in-interest with the information needed to make an informed decision on whether to vote for or against the accompanying plan. Here, however, the Disclosure Statement purportedly submitted on behalf of the Debtor falls far short of the "adequate information" requirements contained in Section 1125 of the Bankruptcy Code and cannot be approved in its current form. Simply stated, the proposed Disclosure Statement does not come close to providing the information parties-in-interest (specifically, unit holders and other tenants at the premises) require to make an informed decision about the proposed Plan.

3.  Conspicuously absent from the Disclosure Statement is any discussion regarding the relationship between Mark Schwartz, the purported President of the Debtor's Board who "primarily" manages the Debtor and David Goldwasser (previously convicted of felony fraud), how these parties became involved with the Debtor in the first place, and the dual, conflicted relationship of Debtor's counsel.

4.  The Disclosure Statement also fails to provide any discussion regarding the various disputes being litigated in this case, particularly the adversary proceeding commenced by Khitterer challenging the purported Board's authority to act on behalf of the Debtor. Rather than disclose this information, the Disclosure Statement disingenuously provides: "[t]he Debtor knows of no pending litigation or potential litigation, except a dispute between a former shareholder and an entity controlled by Mark J. Schwartz, the Debtor's President, regarding the terms of sale of various units." Disclosure Statement, ¶ 50.

5.  Notwithstanding that the Debtor's unit holders are the parties that will be most affected by the proposed plan process, the identity of the members of Class 5 (Interest Holders)

2

and the proposed Plan treatment of such Class 5 members are anything but clear from the proposed Disclosure Statement.

6. Other than a self-serving "estimated" value of the property, the proposed Disclosure Statement contains no appraisal of the property nor are any comparable sale prices to support this "estimate". Without an appraisal or an analysis of comparable properties, and without a sale process that would test the market value of the property, it is frankly impossible for unit holders to ascertain whether the buy-out provisions of the proposed plan will provide unit holders with the highest/best price or even fair market value for their units.

7. Moreover, as discussed herein, the proposed Liquidation Analysis submitted with the Disclosure Statement is contrived and faulty.

8. In addition to these infirmities, the Debtor's purported Board had no authority to file the Plan and Disclosure Statement on behalf of the Debtor. In fact, the Debtor currently has no Board. Even assuming this was not the case, the purported Board never obtained unit owner authorization to file the Plan and Disclosure Statement that was actually filed. Rather, the Board purported to obtain authorization to file a specific version of the Plan and Disclosure Statement and then, without obtaining unit holder authorization and without even notifying unit holders, the purported Board (a/k/a Schwartz) materially altered the Plan and Disclosure Statement and filed this revised version.

9. For these reasons, and as discussed herein in further detail, approval of the proposed Disclosure Statement should be denied pursuant to Section 1125 of the Bankruptcy Code.

# ARGUMENT

## I. Legal Standard Governing Approval of Disclosure Statements

10. The Disclosure Statement does not contain "adequate information" within the meaning of Section 1125 of the Bankruptcy Code and cannot be approved in its current form. Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on the bankruptcy court's determination that the disclosure statement contains "adequate information." The Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of claims or interests in the relevant class to make an informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999) (disclosure statement must contain information that is "reasonably practicable [to permit an] informed judgment" by holders of claims or interests entitled to vote on the plan); *In re Crowthers McCall Patterns, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement 'that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan'" (quoting H.R. Rep. No. 95-595, at 408-09 (1977), reprinted in 1978 U.S.C.C.A.N. 6963, 6364-65); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution"). The Disclosure Statement must provide enough information to enable the Debtor's creditors and equity security holders, as well as this Court, to make an informed judgment about the Plan. *See Kunica v. St. Jean Financial, Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure

statement by the creditors and the court") (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988), *cert. denied*, 488 U.S. 967 (1988)). Accordingly, it is impossible to "overemphasize the debtor's obligation to provide sufficient data to satisfy the Bankruptcy Code standard of 'adequate information.'" *Kunica*, 233 B.R. at 54 (quoting *Oneida*, 848 F.2d at 417).

11. Approval of the Disclosure Statement may furthermore be denied when the plan it describes is patently unconfirmable. *In re Quigley Co.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("approval should be withheld if it is apparent that the plan will not comply with Code § 1129(a) and 2) if it does not contain such information so that all creditors and equity shareholders can make an intelligent and informed decision about whether to accept or reject the plan."); *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) (denying approval of disclosure statement describing unconfirmable plan "to avoid . . . a wasteful and fruitless exercise" that would "further delay a debtor's attempts to reorganize").

### A. The Disclosure Statement Does Not Contain Adequate Information and Fails to Satisfy the Requirements of Section 1125 of the Bankruptcy Code

12. To satisfy the requirements of Bankruptcy Code § 1125(a), a disclosure statement must contain, "at a minimum," adequate information concerning "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Beltrami Enters.*, 191 B.R. 303, 304 (Bankr. D. Pa. 1995) (quotations and citations omitted). Those factors include, among others: (i) a summary of the plan of reorganization and information as to how the plan is to be executed; (ii) a description of the

5

reorganized debtor's business; (iii) projections of future operations that would be relevant to creditors' and equity security holders' determinations of whether to accept or reject the plan; (iv) information regarding current litigation against the debtor or litigation likely to arise in a non-bankruptcy context; (v) an accurate description of the debtor's available assets and its value; (vi) the condition and performance of the debtor while in chapter 11; (vii) information relevant to the risks posed to creditors and equity security holders under the plan; (viii) and the tax consequences of the plan. *See In re Microwave Products of America, Inc.*, 100 B.R. 376, 378 (Bankr. D. Tenn. 1989); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. D. Ohio 1988). A disclosure statement that omits material facts cannot be approved. *In re Unichem Corp.*, 72 B.R. 95, 97-98 (Bankr. N.D. Ill. 1987), *aff'd* 80 B.R. 448 (N.D. Ill. 1987).

13. The Disclosure Statement fails to provide adequate information from which a "hypothetical reasonable investor" could make an informed decision about the Plan.

### 1. The Disclosure Statement Fails to Disclose Conflicts of Interest and the Relationship Between the Main Parties in This Case

14. Conspicuously absent from the Disclosure Statement is any discussion regarding the relationship between Mark Schwartz, the purported President of the Debtor's Board who "primarily" manages the Debtor[1] and David Goldwasser (previously convicted of felony fraud), how these parties became involved with the Debtor in the first place, and the dual, conflicted relationship of Debtor's counsel. Disclosure of these facts is essential to the decision-making process of parties-in-interest in voting to accept or reject the plan.

15. As an initial matter, the Disclosure Statement fails to disclose that David Goldwasser, the manager and principal of secured creditor SAC and proposed Plan funder, and Mark Schwartz, the alleged President of the Debtor and principal of unsecured creditor FIA 164

---

[1] *See* Disclosure Statement, ¶ 54 ("The Debtor is managed by its Board primarily Mark Schwartz, as President.")

6

St Holdings, are long time business partners involved in acquiring distressed real estate through bankruptcy. *See*, *e.g., In re N.Y. Affordable Housing Albany Assoc. LLC*, Chapter 11 Case No. 13-20007 (S.D.N.Y. 2013) (RDD); *In re Van Cortland Village LLC,* 12-20000 (S.D.N.Y. 2012) (RDD).

16. Notwithstanding that the Disclosure Statement is completely silent on this issue, Schwartz and Goldwasser have once again joined forces in this case to acquire the Debtor's property. By way of background, Khitterer agreed in principle to sell five apartments to FIA (Schwartz's entity) referred to herein as Apartments 1, 31, 32, 42 and 44 in a two-step transaction designed to sell certain units at below-market rates and others at market rates. First, Schwartz/FIA would purchase those units referred to as Apartments 31, 1 and 42 at below-market rates. In exchange for obtaining these three units at below-market rates, Schwartz/FIA agreed, among other things, to pay the maintenance of all of the aforementioned five units and to provide sufficient funds to HDFC to rehabilitate the building so that the 7A administrator could be removed, and to pay certain outstanding real estate taxes (and Schwartz/FIA's breach of this agreement and failure to pay these outstanding real estate taxes, in fact, necessitated this Chapter 11 petition). Second, after these steps were completed, Schwartz/FIA was to purchase Apartments 32 and 44 at market value.[2]

17. In addition, in or about February 2014, the Debtor obtained a mortgage on its property in the principal amount of $150,000.00 (the "Mortgage") from Shanghai Holdings LLC ("Shanghai"). The entire $150,000 was not provided to the Debtor; rather, certain of this amount was to be set aside in a segregated account for use by the Debtor. Contemporaneously and as part of the same transaction in which Schwartz allegedly acquired the first three (3) units

---

[2] As discussed below, Khitterer submits that none of these units were actually transferred to Schwartz/FIA.

described above, on or about July 29, 2014, Shanghai assigned the Mortgage to Schwartz's partner, Goldwasser, through his entity SAC.

18. Shanghai was entitled to a contingency fee in connection with its efforts to reduce the Debtor's real estate taxes and water bills. Shanghai, however, agreed to reduce the Debtor's obligation to pay Shanghai such contingency fee to $100,000.00, secured by a new mortgage dated July 29, 2014 in the amount of $100,000.00 in favor of SAC ("Contingency Fee Mortgage"). The two amounts were consolidated into a single $250,000.00 Mortgage provided to SAC pursuant to a Consolidation Extension and Modification Agreement dated July 29, 2014 ("CEMA").

19. Pursuant to the Mortgage, SAC, stepping into the shoes of the Shanghai, was responsible to set aside funds in a separate account for the benefit of HDFC to make repairs. Upon information and belief, however, SAC never provided HDFC with those funds. In addition, Schwartz, as the Debtor's purported Board president, was responsible for making payments on behalf of HDFC to SAC, but did not do so, thereby entitling his business partner, SAC, to obtain the consequent default interest.[3]

20. The Disclosure Statement, however, addresses none of this and, specifically, does not contain any discussion regarding (i) how SAC acquired the Mortgage, from whom and on what terms; (ii) the propriety of allowing SAC's claim and (iii) the potential objections that may be raised thereto.

21. The Disclosure Statement also fails to disclose that Schwartz and Goldwasser jointly negotiated the sale of Khitterer's units and transfer of the Shanghai Mortgage with Khitterer. The identity of interest between Schwartz and Goldwasser (as well as their respective

---

[3] Khitterer reserves the right to seek to equitably subordinate SAC's claim to interest holders.

entities, FIA and SAC) is undeniable. In fact, the title insurance invoice issued in connection with the transfer of the Shanghai Mortgage to SAC was issued to Schwartz (*See* Exhibit A).

22. Moreover SAC and Schwartz were represented by the same attorney, Jeffrey Randall Karp, in connection with the aforementioned transactions, and Mr. Karp acted as the "Authorized Signatory" for both Schwartz's entity (FIA) and Goldwasser's entity (SAC). (*See* Exhibit B). Again, the unity of interest between Schwartz and Goldwasser is nowhere disclosed, and has in fact been hidden from parties in interest and this Court.

23. Nor are the conflicts of the professionals representing the Debtor anywhere disclosed. For example, Efrem Schwalb, Esq. of Koffsky Schwalb, LLC purports to represent the Debtor and has filed a notice of appearance and a motion to dismiss on behalf of the Debtor. Mr. Schwalb, however, is also of-counsel to the law firm Goldberg & Rimberg, PLLC who are the attorneys for the purported lender SAC (Mr. Goldwasser's entity) in this case.

24. These deficiencies are fatal to approval of the Disclosure Statement as these omitted facts speak directly to the integrity of the Plan and the Plan process and raise considerable questions as to whose interests are being served by the purported Board, its purported President and this bankruptcy process.

### 2. The Disclosure Statement Fails to Disclose Disputes Regarding Appointment of the Debtor's Board

25. In the section titled "Litigation Analysis", the proposed Disclosure Statement provides "[t]he Debtor knows of no pending litigation or potential litigation, except a dispute between a former shareholder and an entity controlled by Mark J. Schwartz, the Debtor's President, regarding the terms of sale of various units." Disclosure Statement, ¶ 50. This statement is disingenuous, at best.

9

26.     As the Debtor and its purported Board is well aware, Khitterer commenced Adversary Proceeding No. 15-08276 (RDD) in this case seeking a declaration that the elections held at a special meeting on or about November 10, 2014 are void ab initio and a nullity, and directing that a new Board be elected in accordance with the Debtor's by-laws.[4]

27.     Khitterer submits that the purported transfer of her interests in the Debtor to Schwartz through his entity FIA was never consummated and, therefore, Schwartz, holding no ownership in the Debtor, is not authorized to serve as a Board member.  The board is also comprised of members who are not eligible to serve on the Board and who were elected by unit holders not eligible to vote under the Debtor's by-laws, because they were more than two months in arrears at the time of election which bars them from serving on, or voting for, the Board. Accordingly, Khitterer submits that the purported Board is not authorized to act on behalf of the Debtor – the Debtor essentially has no Board.

28.     None of this, however, is disclosed in the proposed Disclosure Statement.  In fact, Schwartz (pulling the strings of the Debtor) has done his best to sweep these issues under the rug.  The resolution of the aforementioned adversary proceeding will dictate whether the actions of the purported Board, including retention and compensation of professionals, negotiations with New York City regarding foreclosure, and the filing of the proposed Plan and Disclosure Statement were valid in the first instance.  Indeed, the proposed Disclosure Statement cannot be approved if the Debtor's purported Board was not authorized to even file the Disclosure Statement.

29.     From reading the proposed Disclosure Statement, parties-in-interest would have no idea that this case has been plagued from day one by in-fighting among Khitterer and the

---

[4] The proposed Disclosure Statement also makes no mention of Adversary Proceeding No. 15-08277 (RDD), nor does it include any discussion regarding the dispute with the city and the Debtor's argument against allowing the city to foreclose on the property.

Debtor's purported board members regarding the ownership of Khitterer's interests in the Debtor and who may serve as a Board member pursuant to the Debtor's by-laws.

### 3. The Proposed Disclosure Statement Fails to Provide Adequate Information with Respect to Class 5 (Interest Holders) Claims

30. The identity of the members of Class 5 (Interest Holders) and the proposed Plan treatment of such Class 5 members are anything but clear from the proposed Disclosure Statement. As an initial matter, in describing the members of Class 5, the proposed Disclosure Statement refers, alternatively, to (i) "Interest Holders"; (ii) "shareholders"; and (iii) "owner-occupants". *See* Disclosure Statement, ¶ 35. Whereas the term "Interest Holder" is defined in the proposed Plan, the terms "shareholder" and "owner-occupant" are nowhere defined and it is unclear whether these terms are meant to be synonyms with "Interest Holders" or if Schwartz (as the effective Plan proponent) intends to apply different meanings to these terms.

31. In this regard, it should be noted that not all tenants residing at the Debtor's property actually own the units they reside in and, therefore, are likely not entitled to vote on the proposed Plan or receive the treatment afforded to Class 5 members. Upon information and belief, substantial confusion exists on this issue and tenants who may not otherwise own the units they occupy believe they are entitled to vote and to receive the treatment afforded to Class 5 members. This is exactly what disclosure was intended to prevent.

32. Accordingly, at a minimum, the Debtor should clarify which tenants are actually Class 5 members entitled to vote on the proposed Plan and receive Class 5 treatment.

33. As a corollary, the proposed Disclosure Statement is silent regarding the treatment of tenants who are not otherwise Class 5 members. Presumably, although not explicitly stated in

11

the Disclosure Statement, these tenants will simply be evicted, allowing for SAC to lease their units to others for its own account.

34. The proposed Plan treatment of Class 5 members and the proposed Disclosure Statement's description thereof is also far from clear. Paragraph 35 of the proposed Disclosure Statement appears to provide at least certain tenants with the right to either bring current their overdue maintenance or sell their units to SAC for $40,000 (together with other rights). Paragraph 35 of the proposed Disclosure Statement then provides a third option – cancellation of their interests which then revert to the Debtor. How and when this third option is triggered is entirely unclear. According to the Disclosure Statement, if this third option is triggered, SAC is entitled to purchase the unit from the Debtor for $20,000 (far below market value) and the unit holder will be forced to forfeit their units and receive absolutely nothing under the proposed Plan.

35. Although the proposed Disclosure Statement provides that "[e]ach Shareholder has the right to dispute the amount of overdue maintenance", Disclosure Statement, ¶ 35, it provides no description of the process needed to lodge such dispute. Indeed, to date, the Debtor has not even disclosed the amount of each unit holder's alleged overdue maintenance. Considering that the Debtor readily concedes that "[p]ayment of back maintenance . . . will be a problem for a number of shareholders", Disclosure Statement, ¶ 17, disclosure of such overdue amounts is a necessary prerequisite for making an informed decision on whether to vote for or against the proposed Plan.

36. And although the Debtor discloses the proposed immediate three-fold increase in maintenance going forward, the Disclosure Statement is completely silent regarding the potential for additional future increases in maintenance which may result in the ultimate inability of unit

12

holders to satisfy same and lose their interest (even after bringing their present overdue maintenance current).

37.     Finally, in light of the lack of a proposed sale process for the property subject to higher and better offers, the only options available to Class 5 members is the treatment provided to them under the plan or foreclosure by New York City. The proposed Disclosure Statement, however, provides no information to Class 5 members regarding the rental payments that would otherwise need to be made by unit holders in the event that the city forecloses (other than stating that unit holders would lose their equity interest). Unit holders should be provided the information necessary in order to make an informed decision whether to attempt to retain their ownership interests under the proposed Plan process or would rather (for economic or other reasons) continue residing at the property as a tenant after the city forecloses.

### 4.     The Disclosure Statement Fails to Provide Information Regarding Valuation of the Property

38.     Surprisingly, the Debtor submits that in the fourteen (14) months since this case was commenced no appraisal for the property has been obtained by the Debtor's management. Disclosure Statement, ¶ 12. Without an appraisal or an analysis of comparable properties, and without a sale process that would test the market value of the property, it is frankly impossible for unit holders to ascertain whether the buy-out provisions of the proposed plan will provide unit holders with the highest/best price or even fair market value for their units.

39.     Without the benefit of an appraisal, Schwartz suggests that the property is worth approximately $3,500,000. Based on the recent appraisal obtained by Khitterer from Ariel Property Advisers, Schwartz has conveniently missed the mark by a long shot. Contrary to Schwartz's "estimate," the appraised value of the property is approximately $4,100,000 (on the low end) to $8,000,000 (on the high end) – more than double Schwartz's "estimate."

40. Parties in interest have no way of making an informed decision regarding the Plan and whether they are receiving fair market value for their units without a reliable basis to value their property.

### 5. The Proposed Chapter 7 Liquidation Analysis is Faulty and Contrived

41. The proposed Disclosure Statement provides that, based upon the liquidation analysis annexed as Exhibit B to the proposed Plan, "[i]f a liquidation occurs, the value of the Debtor's property would be reduced by administration expenses and a forced sale discount to fair market value." Disclosure Statement, ¶ 53.

42. As an initial matter, the liquidation analysis provides that liquidation of the property would result in $3,500,000 in sale proceeds. It is particularly telling that the Debtor refers to this sale price as a "forced sale discount to fair market value." Disclosure Statement, ¶ 53. Apparently, Schwartz concedes that his "estimated" value of the property is well below market value.

43. Moreover, there is nothing about a Chapter 7 process that would prevent a Chapter 7 trustee from selling the property to a stalking horse bidder, subject to higher and better offers and an auction process. A Chapter 7 trustee can and often does precisely this to ensure that the highest and best price is received for debtor property. The proposed liquidation analysis and the Disclosure Statement's description thereof only validates the conclusion that it is Schwartz's plan process that will result in a forced sale discount to fair market value to the detriment of unit holders and that a Chapter 7 process would actually increase distributions and value for all parties in interest.

44. Comparing the proposed liquidation analysis to the "Assets and Liabilities" section of Exhibit B to the Plan reveals that the only purported difference between the proposed Plan and a Chapter 7 liquidation is a purported increase to administrative expenses.[5] In this regard, whereas Chapter 11 administrative expenses are estimated to amount to $100,000, the Debtor submits that administrative expenses in a Chapter 7 proceeding would amount to a whopping $600,000. There is absolutely no basis for an estimated six-fold increase in administrative expenses in the event of a Chapter 7 liquidation, and the Debtor should be put to task to explain how it arrived at this figure.

## II.  The Debtor Lacked Corporate Authority to File the Proposed Plan and Disclosure Statement

45. It cannot be overstated that Schwartz is not the Debtor in this case and he may not act on behalf of the Debtor absent the corporate authority (which he lacks) to do so. Nonetheless, Schwartz and, by association, his fellow ineligible board members, have been managing the Debtor as debtor-in-possession for Schwartz's own benefit (although, through lack of information and bankruptcy sophistication, Schwartz's fellow Board members are likely unaware they are being used as pawns in this process). In short, Schwartz has hijacked the Debtor's Board in an effort to ensure that the Board furthers his own self-interest, to the substantial detriment of other parties in interest.

46. Movant submits that the current purported Board, besides being hopelessly conflicted and self-interested, is improperly constituted and not authorized to act on behalf of the Debtor and this estate. First, the purported transfer of Movant's interests in the Debtor to Schwartz through his entity FIA was never consummated and, therefore, Schwartz, holding no

---

[5] To be sure, there is also an inconsequential increase in SAC's purported secured claim in a Chapter 7 proceeding as opposed to under the proposed Plan. As discussed herein, Khitterer submits that SAC's secured claim should be allowed in an amount substantially less than the amount filed.

ownership in the Debtor, is not authorized to serve as a Board member. Second, the board is comprised of members who are not eligible to serve on the Board and who were elected by unit holders not eligible to vote under the Debtor's by-laws, because they were more than two months in arrears at the time of election which bars them from serving on, or voting for, the Board. Accordingly, the purported Board is not authorized to act on behalf of the Debtor – the Debtor essentially has no Board. Finally, there was no verification that the individuals voting were actually shareholders entitled to vote.

47. Furthermore, in what can only be characterized as a bait and switch tactic, the draft plan and accompanying disclosure statement circulated to parties in interest in advance of the purported Board meeting held to authorize the Board's filing thereof differs substantially from the plan and accompanying disclosure statement actually filed with the Court. While the original version that was subject to a vote included a provision requiring SAC to make loans to equity security holders to cover certain assessments, the version actually filed with the Court includes no such provision. Compare Exhibit C (Disclosure Statement, ¶27; Plan, ¶55) to Exhibit D (Disclosure Statement, ¶35; Plan, ¶56).

48. Moreover, while the original draft provided that any shortfall between available cash and Effective Date obligations would be funded by an assessment on each unit, the filed version provides that such shortfall will be funded by an additional new mortgage from SAC. Compare Exhibit C (Disclosure Statement, ¶31; Plan, ¶58) to Exhibit D (Disclosure Statement, ¶38; Plan, ¶59).

49. In short, even assuming the Board was properly constituted and authorized to submit a plan and disclosure statement for a unit holder vote (which, as discussed above, it was

16

not), the Board never received authorization from Unit Holders to file the Plan and accompanying Disclosure Statement actually filed with the Court.

50.     In short, the proposed Disclosure Statement cannot be approved by this Court as the Board was never authorized to file same.  Moreover, the Plan is patently unconfirmable for the same reason and, therefore, approval of the Disclosure Statement should be denied.

## CONCLUSION

**WHEREFORE**, for the reasons discussed herein, Khitterer respectfully requests entry of an order denying approval of the proposed Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, and granting Khitterer such other and further relief as it deems just and proper.

Dated: New York, New York
　　　　July 8, 2016

                         WHITE & WOLNERMAN, PLLC

                         By:/s/ David Y. Wolnerman
                             David Y. Wolnerman, Esq.
                             950 Third Ave., 11th Floor
                             New York, New York 10022
                             dwolnerman@wwlawgroup.com
                              Phone: (212) 308-0667

                         *Attorneys for Khitterer Parties*